**Slip Op. 00-143**

# UNITED STATES COURT OF INTERNATIONAL TRADE

```
_____
                                        :
WORLD FINER FOODS, INC., et al.         :
                                        :
          Plaintiffs,                   :
                                        :
          v.                            :
                                        :   Consol. Court No.
THE UNITED STATES                       :    99-03-00138
                                        :
          Defendant,                    :
                                        :
          and                           :
                                        :
BORDEN, INC., NEW WORLD PASTA CO.,      :
AND GOOCH FOODS, INC.,                  :
                                        :
          Defendant-Intervenors.        :
_____ :
```

[Commerce Antidumping Duty Remand Determination
Affirmed in Part.]

Dated: November 3, 2000


Akin, Gump, Strauss, Hauer & Feld, L.L.P. (Spencer S. Griffith, Patrick F. J. Macrory and Thomas J. McCarthy) for plaintiff World Finer Foods, Inc.

O'Melveny & Myers L.L.P. (Peggy A. Clarke, Veronique Lanthier and Gary N. Horlick) for plaintiff Barilla Alimentare, S.p.A.

Barnes, Richardson & Colburn (Matthew T. McGrath and Michael J. Chessler) for plaintiff La Molisana Industrie Alimentari, S.p.A.

David W. Ogden, Assistant Attorney General, David M. Cohen, Director, Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice (Erin E. Powell), Patrick V. Gallagher, Jr., Senior Attorney, Office of the Chief Counsel for Import Administration, United States Department of Commerce, of counsel, for defendant.

Collier, Shannon, Rill & Scott (Paul Rosenthal and David Smith) for defendant-intervenors Borden, Inc., New World Pasta, Co. and Gooch Foods, Inc.

## Opinion

**RESTANI, Judge:** This antidumping duty matter is before the court following a remand determination by the Department of Commerce ("Commerce"). Familiarity with the court's opinion ordering remand is presumed. See World Finer Foods, Inc. v. United States, No. 99-03-00138, 2000 WL 897752 (Ct. Int'l Trade June 26, 2000). World Finer Foods, Inc., which will be liable for duties at the 19.09 percent fact available rate assigned Arrighi S.p.A. Industrie Alimentari, accepts the remand results. La Molisana Industrie Alimentari, S.p.A. also accepts the new assessment rates applicable to its two importers. The only dispute remaining is whether Commerce properly selected an adverse facts available rate of 63.36% for Barilla Alimentare, S.p.A. ("Barilla").

There is no dispute that an adverse rate may be used and that the rate is adverse. There also appears to be no dispute that the rate selected is based on at least partial secondary information which must be corroborated pursuant to 19 U.S.C. § 1677e(c) (1994). The only issue is whether the rate selected is properly corroborated so that it "bears a rational relationship to the probability of dumping." World Finer Foods, 2000 WL 897752, at *9.

## Facts

Commerce arrived at the new adverse facts available rate for Barilla in the first administrative review period ("POR") by constructing a normal value ("NV") from Barilla price lists obtained in Italy by a market researcher hired by petitioners. To construct a United States Price ("USP") for comparison, Commerce used average unit value ("AUV") data from U.S. Customs import statistics for the POR. Commerce made comparisons in three price categories. It adjusted NV in each category for home market discounts and credit expenses and applied an average exchange rate for the POR.

USP was adjusted for U.S. credit expenses calculated from Federal Reserve System data, the per/kilogram price was converted to a per/pound price and an average exchange rate was used again. The three comparisons resulted in margins of 39.63%, 60.09% and 63.36%. Commerce concluded that its best estimate of Barilla's "real" margin is the simple average of 45.49%. As it was drawing an adverse inference under 19 U.S.C. 1677(e)(b), it selected the highest margin calculated, that is, 63.36%.

## Discussion

As a preliminary matter, Barilla objects that Commere reopened the record. The court's remand order did not restrict the scope of Commerce's reconsideration to the facts originally

of record.  When the court is silent in this regard, Commerce has the discretion to conduct its reconsideration as it sees fit. See E.I. DuPont de Nemours & Co. v. United States, 8 F. Supp. 2d 854, 860 n.5 (Ct. Int'l Trade 1998) (citation omitted); Win-Tex Prods., Inc. v. United States, 843 F. Supp. 709, 712 (Ct. Int'l Trade 1994).  Barilla also complains that it did not have access to the new data and could not respond and submit its own data. The price list used for NV, however, was attached to the draft results and Barilla had access to a public version of the market research.  Barilla was also permitted access to AUV data as to itself, but not that of other companies.  Even now Barilla does not say what data it would have submitted.  Even though, at this late date, Barilla is not permitted to submit the type of data that it should have included in its questionnaire response, it is unclear that Commerce would have rejected public information which would show that the data it was relying on was false or not usable.  Given these facts, Barilla's complaints are insufficiently specific to demonstrate that its procedural rights were violated or that the process was unfair.

Barilla first challenges the use of the price list from the petition because it contains many prices for packages over five kilograms.  Subject merchandise is five pounds or under.  The prices which resulted in the high margin selected by Commerce, however, were for subject merchandise.  Barilla also objects to

the list because it is a price list for caterers.  Sales to the

catering industry are not outside the investigation, although a

broader based price list would have been more useful.  Barilla

also argues that the product line featured in the list is of a

high quality and is not sold in the United States.  There is no

evidence, however, demonstrating the differences in the products.

Thus, Commerce cannot adjust for this in a quantifiable way, such

as through an ordinary difmer (difference in merchandise)

adjustment.

The problem with the NV data is not so much that it is

inherently unusable, but that it was not corroborated.

Section 1677e(c) of Title 19 reads as follows:

(c) **Corroboration of secondary information**

When the administering authority or the Commission
relies on secondary information rather than on
information obtained in the course of an investigation
or review, the administering authority or the
Commission, as the case may be, shall, to the extent
practicable, corroborate that information from
independent sources that are reasonably at their
disposal.

Commerce asserts that it corroborated the information by speaking

with the market researcher who provided it.  However probing the

questions were, they were not answered with independent data nor

did Commerce find its own "independent sources."  While the

prices are not out of line with prices on price lists of other

Italian producers -- and thus corroborated as valid "price list"

prices, the investigation revealed widespread discounting practices. See Remand Determination at 12. Thus, the corroboration is suspect. The corroboration requirement, however, is not absolute. It requires corroboration "to the extent practicable." Barilla has not posited a way for Commerce to corroborate further an NV for Barilla. Thus, the court concludes, as to this particular set of data, no further corroboration is necessary to satisfy the statute.

Barilla next takes issue with Commerce's use of Barilla's AUV for USP because the AUV was based on sales to affiliates. Barilla does not state that there is the same type of data on Barilla for sales to non-affiliates so that Commerce would be able to construct USP for Barilla from such data or from a combination of data on sales to affiliates and non-affiliates. Whether or not the AUV data used by Commerce, which comes from importer-specific entry data, is "secondary information" that must be corroborated, Barilla has not offered an alternative publicly available basis for USP or suggested how USP might be further corroborated. Nor has Barilla demonstrated that this data is unreliable.[1]

_____

[1] As the Barilla-specific, government-gathered, AUV data was obtained by Commerce after a reopening of the record in this review, it may not be subject to the statutory corroboration requirement. Base NV data, however, was petition data, was not obtained directly from governmental sources or Barilla itself,

(continued...)

Barilla also has no basis for complaint about the various adjustments to NV and USP, as there is no record evidence for Barilla-specific adjustments. The adjustments made by Commerce seem reasonable and conservative under the circumstances. Commerce asserts that 45.49% average margin is very conservative, as well as the best estimate of Barilla's margin. The question the court asks is whether the 45.49% margin is *not* conservative, but already has built into it the "addition" to assure an adverse margin. Essentially because it was so out of line with margins based on record data, the court rejected use of the highest margin in the petition, 71.49%, as an adverse facts available margin for Barilla in <u>World Finer Foods</u>, 2000 WL 897752, at *6. The margins near that level likely suffer from the same defects. That is not to say that with adequate corroboration an adverse facts available margin that is widely divergent from other margins may not be used. As indicated, however, here the base NV selection lacks such reliable corroboration.

Most companies had very low margins, and those such as Barilla, which sold through affiliates, had margins under ten percent. The highest margin for any other producer was 21.345%. Barilla's AUV was approximately twenty percent lower than that of

---

[1](...continued)
and does require corroboration to the extent practicable. The statute would make no sense if the corroboration requirement could be met merely by incorporating petition data in the review.

other producers.  Accordingly, this information supports a

Barilla margin in the 20-40% range.   The 45.49% margin is more

than double the highest margin, and even further above the

margins for cooperative respondents.[2]  It is also above the high

end of a likely range for Barilla based on the AUV data, which

the court finds more reliable than the NV data.  As the 45.49%

average margin is partially uncorroborated and does not have

built into it the NV discounts that are normal in this industry,

it is an adverse margin.  In sum, the court finds that

substantial evidence is lacking to support an adverse margin in

the 60-70% range.  The only margin available that is supported by

the evidence is the margin of 45.49%, Commerce's best guess,

which, based on this record, is adverse.

Barilla, for its part, has no basis to demand a margin lower

than the best estimate Commerce can make.  Unlike DeCecco,

another pasta producer with which Barilla seeks to align itself,

it did not put in evidence to show it was a high-end producer

which would likely have low margins under the facts of record.

See Borden, Inc. v. United States, 4 F. Supp. 2d 1221, 1247 (Ct.

Int'l Trade 1998), aff'd sub nom. F.lli DeCecco di Filippo Fara

---

[2]  The court is aware of the self-selective nature of
reviews for companies with low rates and of the falling AUV's
from the investigation to the first review, and considers these
factors more than accounted for in the 45% rate, which is several
percentage points above what is otherwise supportable.

San Martino S.p.A. v. United States, 216 F.3d 1027, 1032-33 (Fed. Cir. 2000).  Barilla has nothing to offer to demonstrate it should not receive a margin of 45.49%.[3]  Nor has it suggested any margin within a reasonable range.  There being no other supportable margin available, Barilla is to be assigned a 45.49% margin.

_____
Jane A. Restani
JUDGE


Dated:  New York, New York

    This 3rd day of November, 2000.

_____

[3]  Barilla may have preferred some average other than a simple average of the calculated margins, but it waived any such argument.